Filed 8/22/25  In re Juan P. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re JUAN P., a Person Coming Under the Juvenile Court Law. | D084004 |
| THE PEOPLE, | |
| Plaintiff and Respondent, | (Super. Ct. No. J239879) |
| v. | |
| JUAN P., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Tilisha Martin, Judge.  Affirmed.

Stephanie M. Adraktas, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

The juvenile court declared Juan P. (Minor)[1] a ward of the court (Welf. & Inst. Code,[2] § 602) after the court found he committed second degree murder (Pen. Code, § 187, subd. (a)) when he was nearly 18 and that he personally used a knife in the commission of the offense (*id*., § 12022, subd. (b)(1)).  After a contested disposition hearing, the court committed Minor to a secure youth treatment facility for a baseline term of four to seven years, and a maximum term of confinement of 15 years to life, plus one year.

On appeal, Minor contends the juvenile court abused its discretion by sending him to a secure youth treatment facility instead of to a less restrictive program.  He also contends the court erred by selecting a maximum term of confinement that extends beyond his twenty-fifth birthday because the court will lose jurisdiction over him on that occasion.

Neither of Minor's contentions has merit.  As to his first argument, the juvenile court explained in detail why it concluded a less restrictive disposition was not suitable.  Substantial evidence supports the findings on which the court made this decision.  Regarding Minor's second assertion, we are persuaded by recent authority holding that statutory age limits operate independently from statutory terms of confinement.  (See *In re L.H.* (2025) 110 Cal.App.5th 591, 600–601.)

Accordingly, we affirm the judgment.

---

[1]    Early in the pendency of this matter, Minor reached 18 years of age. For clarity we refer to him as Minor throughout this opinion, even though several months after his arrest he achieved the age of majority.

[2]    Further undesignated statutory references are to the Welfare and Institutions Code.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

The underlying offense occurred at the Imperial Beach pier on September 1, 2022, over the Labor Day weekend. The events were largely recorded by security cameras (without audio) and the footage was played at trial.[3]

The 19-year-old victim, Victor Villa, and his 20-year-old friend, Abraham G., went fishing on the pier late in the afternoon.[4] Abraham had a bucket that contained fishing gear, including a folding pocketknife. After fishing for several hours with no luck, Villa and Abraham decided to leave.

As Villa and Abraham walked on the pier toward land, they passed Minor (then about three months shy of 18) and his 16-year-old friend, Javier V. Although neither duo knew the other, Villa "mad dogg[ed]" Javier and they yelled "what's up" at each other. Minor and Javier asked Villa and Abraham if they wanted to fight in the parking lot. Abraham testified that Villa reached toward his own hip and lifted his shirt briefly, gesturing as if he had a weapon. Villa did not actually pull a weapon, and Abraham testified he never saw Villa with one that night. Abraham suggested they fight on the pier "so it could be fast." The groups appeared to spar and verbally insult each other briefly on the pier before Minor and Javier headed toward land. Villa and Abraham followed from a distance.

---

[3]     We have also watched the footage.

[4]     Out of respect for the victim, we identify him by his full name. Consistent with rule 8.90(b)(10) of the California Rules of Court (further rule references are to these rules), we identify other participants only by their first name and last initial.

After a few seconds, Villa and Abraham jogged to catch up to Minor and Javier.  The pairs exchanged a few blows — Villa with Javier, and Abraham with Minor.  Abraham and Minor disengaged with each other and resumed walking toward shore; Villa and Javier remained engaged near the pier entrance for about 30 seconds, occasionally exchanging blows.  Minor ran back and joined Javier in engaging with Villa; Abraham walked toward the skirmish.

Minor and Abraham disengaged when three young males, whom Abraham thought "looked . . . like gangbangers," entered an open area near the pier entrance.  After Minor greeted two of the males, Abraham gestured to Villa to leave and "kind of walked away . . . because [he] didn't want to get jumped."  The newcomers continued on to the pier and suggested the fighters leave because there were " 'a lot of cops around.' "

Minor, Javier, Villa, and Abraham reconvened under a lamppost in an open area near the pier entrance.  An older male acquaintance of Minor and the acquaintance's female friend were also there.  The acquaintance and his friend had skateboards with them and they were talking and playing hacky sack.  Javier looked in Abraham's bucket and asked why he had a knife.  Abraham explained it was for fishing.  Abraham testified he never took the knife out of his bucket during the incident, nor did he see Villa with a knife at any time.

The acquaintance appeared to try to make peace as the group congregated near the lamppost.  Villa reached into his right front pants pocket, pulled something out, and handed it to the acquaintance.  The acquaintance put the object in Abraham's bucket, which Abraham had set on the ground.  The acquaintance then reached back into the bucket and removed something.  As this was happening, Minor began trying to punch

4

Abraham and ultimately picked up the acquaintance's skateboard and swung it like a weapon.  Minor engaged with Abraham, and Villa engaged with Javier.

Minor and Abraham stopped fighting, while Javier and Villa kept trying to punch and kick each other.  Minor approached his acquaintance and gestured for the acquaintance to hand him something.  The acquaintance complied.  As Javier and Villa fought, Javier fell to the ground and Villa tried to kick him in the head as Javier got back up.  It appears from the video footage that Minor was not watching them when this happened.  As Javier got back on his feet and retreated from Villa, Minor turned, ran quickly toward Villa, and made a quick motion with one hand toward Villa's torso. Javier was 10 to 15 feet away from Villa when Minor engaged Villa.

Minor and Javier ran to the parking lot and began driving away in Javier's car.  Villa and Abraham walked a different direction toward the street fronting the pier.  They did not realize Villa had been stabbed.  When Villa and Abraham reached the street, Minor and Javier drove by and Minor yelled out the passenger window, " 'Check your stomach.' "  Villa and Abraham then realized Villa had been stabbed and was bleeding.  The two sat down across the street from the pier and Villa bled profusely.  Abraham called 911 and an ambulance responded.  Villa was transported to the hospital, where he later died.

Two days after the fight, on September 3, 2022, Minor was arrested at the U.S.–Mexico border.  After being advised of his rights, he gave a statement to detectives.  Minor stated he had just been discharged from the hospital after having his appendix removed.  He claimed Villa and Abraham both brandished knives when they first exchanged words.  The acquaintance told everyone to "stash [their] knives" and "make this a fair fight."  Minor told

5

the detectives that Abraham put his knife down, but Villa put his in his pocket. Minor said he acted in self-defense when he retrieved a knife from the acquaintance and stabbed Villa. Minor told the detectives he discarded the knife by a house near the beach. He claimed Javier had been sliced and "was bleeding pretty good," so Minor drove them back to Javier's house. Minor did not tell Javier's mother what happened, nor did Minor say anything to his own mother about the altercation because he knew she would be mad and would want to turn him in. Minor insisted he acted in self-defense and was "so, so, so shocked" to learn Villa died.

Investigators looked for the knife but never found it. They found one knife in Abraham's fishing bucket, but it was not Abraham's knife. Presumably, then, the acquaintance put Villa's knife in Abraham's bucket and removed Abraham's knife from the bucket and gave it to Minor during the fight.

To explore Minor's self-defense claim, investigators searched Javier's car and found no evidence of blood. They also examined Javier's body and saw no injuries. Javier told investigators " 'he was punched in the face but had no injuries' " from the incident.

## B. Procedural Background

The prosecution filed a wardship petition in juvenile court alleging Minor committed second degree murder (Pen. Code, § 187, subd. (a)) and personally used a deadly weapon in the commission of the offense (§ 12022, subd. (b)(1)).

The prosecution moved to transfer the petition to adult criminal court. At an extensive contested hearing, the prosecution introduced evidence regarding the current charged offense, Minor's disciplinary issues in custody while awaiting trial, his criminal history, and prior performance on

6

probation. Minor introduced evidence regarding his family dynamics, his good behavior and educational progress in custody while awaiting trial, his extensive childhood psychological trauma, his receptiveness to and progress with counseling while in custody, and the counseling services available through the juvenile court. Minor also introduced testimony from a probation officer who determined Minor was amenable to rehabilitation under juvenile court jurisdiction and recommended that his case remain there. After considering the evidence and argument, the juvenile court found Minor was amenable to rehabilitation in juvenile court and declined to transfer the case to adult criminal court.

At the contested jurisdictional hearing, the juvenile court received evidence establishing the facts summarized above. A psychologist, Madeleine Starin, testified for the defense about the fight-or-flight response, adolescent brain development, and her assessment of Minor. Dr. Starin testified Minor suffered from complex trauma;[5] she diagnosed him with post-traumatic stress disorder (PTSD), depression, and anxiety. She acknowledged, however, that adolescent brains can still process information, follow rules, and understand the difference between right and wrong. The court ultimately sustained the petition.

Following a contested disposition hearing, the juvenile court committed Minor to the Youth Development Academy (YDA), a secure youth treatment

---

[5] Dr. Starin explained the term "complex trauma" means "repeated exposure to traumatic events where . . . the problem becomes the norm in a sense and we adapt and adjust to those circumstances."

facility, for a baseline term of confinement of four to seven years,[6] with a maximum term of confinement of 15 years to life, plus one year.

## III.  DISCUSSION

### A.  The Juvenile Court Did Not Abuse Its Discretion by Committing Minor to YDA

Minor contends the juvenile court abused its discretion by committing him to YDA instead of to a suitable less secure facility, the Healing Opportunities for Personal Empowerment (HOPE) program.  We are not persuaded.

#### 1.  Background

##### a.  Prosecution Evidence

At the disposition hearing, the prosecution presented testimony from two probation officers, Claudia Legorreta and Daisy Mendez.

Legorreta, a juvenile probation officer at YDA, testified about that facility and its services.  YDA is a locked residential facility in San Diego County that houses youths aged 14 to 24 who have committed qualifying serious offenses.  Youths are committed to YDA for four to seven years, but good behavior can cut that time in half.  The YDA facility recently underwent a "softening" remodel to make it more "home like."  The facility provides schooling, nutritious food, and exercise activities.  YDA allows family visits, encouraging family involvement and therapy.  YDA staff are trained in trauma-informed care, and adolescent care, and provide "trauma-focused

---

[6]    A baseline term of confinement is "the time in custody necessary to meet the developmental and treatment needs of the ward and to prepare the ward for discharge to a period of probation supervision in the community." (§ 875, subd. (b)(1).)

cognitive behavioral therapy" and "dialectical behavioral therapy."[7] Staff also provide individual and family therapy, substance abuse therapy, psychiatric services, medication management, and vocational training. Rehabilitation services are individualized based on input from the youth and other professionals. Therapy is provided via a phased "stepping stone" approach. YDA requires participation in certain programming, such as "victim's impact, DBT, substance abuse, [and] courage for a change." While at YDA, youths work with a reentry officer who helps "link them" to "services outside in the community." Upon release, youths typically receive six months of supervision and support services in the community.

Juvenile probation officer Daisy Mendez, who prepared the social study for Minor, also testified. To prepare her report, she reviewed relevant documentation and interviewed Minor and each of his parents several times. Mendez testified Minor "did very well" in elementary school but got into trouble in middle school (including being suspended for breaking into the school with other minors). After having absence issues at two in-person high schools, Minor transitioned to online education, where "he did much better." After being detained in this case, Minor completed high school and began taking online college courses.

Mendez testified Minor had six disciplinary incidents while detained, though most occurred early in his nearly 20-month detention.[8] Aside from

---

[7] Dialectical behavior therapy (DBT) "teach[es] emotion regulation skills, distress tolerance, and interpersonal effectiveness."

[8] Minor was involved in two fights; acted disrespectfully towards, and made threatening comments to, a female officer; was involved in a near fight; and disobeyed orders to return to his room during a unit disturbance. The disobedience incident occurred about three months before the disposition hearing.

the disciplinary incidents, Mendez acknowledged Minor generally performed well in custody.

Mendez testified Minor had been placed on probation and received services twice before, for petitions filed in 2017 (for breaking into his middle school) and in 2019 (for assault by means of force likely to produce great bodily injury). Minor successfully completed probation in each case but violated his probation terms several times.

Mendez screened Minor for participation in YDA and recommended that disposition based on his age and the time guidelines for the YDA program — Minor would soon turn 20 and had extensive childhood distress to work through, which included parental separation, his father's substance abuse, and other trauma.

Mendez also considered whether Minor should be committed to the HOPE program. HOPE focuses on mental health diagnosis, substance use, and criminogenic needs, and offers therapy with licensed therapists, medical consultations, family services, DBT groups, psychoeducational groups, vocational and career services, life skills, enrichment, and pet assisted therapy. Mendez explained she ultimately did not recommend a HOPE commitment because of its limited allowable age requirement and duration guidelines. Specifically, while HOPE is available to youths aged 16 to 18 (with upward deviations allowed by court order), Minor was already nearly 20 years old. In addition, whereas a HOPE commitment can be completed in just six months, Mendez believed Minor "would need a longer time to be able to receive therapeutic services" to address his extensive childhood trauma.

### b. Defense Evidence

Minor called several witnesses to support his request for a commitment to HOPE.

Norman Severe, a senior psychologist for the County of San Diego's Juvenile Forensic Services and STAT team,[9] testified about a three-month period during which he treated Minor while in pretrial detention. Minor was receptive to therapy and managed to "stay clear" of trouble in the unit. Dr. Severe believed Minor would benefit from the services offered through HOPE. On cross-examination, Dr. Severe acknowledged that his observations of Minor occurred in a controlled custodial environment, and that Minor's therapy sessions focused mostly on adjusting to being detained and on "relationship issues" with his girlfriend. Dr. Severe did not recall any treatment addressing Minor's trauma. Dr. Severe acknowledged that Minor could be released from HOPE in as little as six months, and that a youth with "a complex diagnosis" that includes PTSD and childhood trauma could benefit from "long-term treatment." He further recognized that when a youth "is reintegrated into the community[,] . . . sometimes life gets in the way and treatment is not as . . . consistent as if they were back doing HOPE or in a custodial setting."

Adam Mortera — who, after serving 22 years in custody for a murder he committed when he was a minor, became the executive director of Juvenile Justice Advocates of California — testified about mentor services he provided Minor during pretrial detention. Mortera testified Minor was remorseful for his prior bad acts, was "very engaged" in programming, and had a positive attitude. Mortera acknowledged "someone who has complex

---

9 STAT means "Stabilization, Treatment, Assessment, and Transition."

11

trauma . . . would benefit from long-term therapeutic services" that "should be intensive."

One of Minor's teachers during pretrial detention, Matt Kruger, testified that Minor was "a very good student," "was very respectful," and "always had a great attitude." Minor's attitude and behavior put him in the top 1 percent of Kruger's students. Kruger acknowledged he had only interacted with Minor in a controlled custodial setting and had not talked to Minor about Minor's crimes or emotional or mental health needs.

Araceli Ramos testified that she is a behavioral health manager for the probation department and provides services through HOPE. Ramos testified that the minimum custodial commitment to HOPE is six months and that participants must complete at least 24 DBT sessions and meet behavioral milestones. Although HOPE could serve youths as old as 25, Ramos testified the average age of HOPE participants was 15 to 19. Upon release, HOPE clinicians link participants to service providers in the community and recommend — but do not require — 30 days of postrelease services. Ramos explained that YDA and HOPE offer different aftercare because youths are committed to YDA for longer periods of time and for more serious offenses.

Dr. Starin, the psychologist who testified at Minor's jurisdictional hearing, testified again at the disposition hearing. She reviewed extensive documentation and interviewed Minor several times. Dr. Starin's general impression of Minor was that he was very ashamed, remorseful, and depressed. She diagnosed him with PTSD, and "adjustment disorder with accompanying depression and anxiety, secondary to being arrested and incarcerated." Dr. Starin concluded Minor had suffered "Type II" complex development trauma, which arises from "pervasive chronic events of trauma." In Minor's case, the trauma included physical and psychological abuse. The

12

doctor noted Minor's situation "really turned around" mid-childhood when his mother made efforts to improve the family's stability and financial situation. Nevertheless, Dr. Starin believed Minor's history of trauma made him hypersensitive and reactive to threatening situations. That, plus his undeveloped youthful prefrontal cortex and his desire to play a protector role, may have contributed to the murder. Dr. Starin testified that out of the hundreds of similar evaluations she had conducted, Minor's stood out as a positive "outlier." He also scored "pretty high" "on the spectrum of amenability" to treatment and low for his risk of recidivism. The doctor opined Minor had been very successful in his restrictive environment and that he was likely to succeed if treated in a less restrictive environment. She stated she was "a firm believer" in "step-down programming at each stage" in the "continuum of care."

Dr. Starin acknowledged she had never administered a custodial rehabilitation program and had not spoken with any of Minor's treatment providers. She also agreed Minor would benefit from long-term therapeutic services. He had not yet participated in any "trauma-focused cognitive behavioral therapy" or "any intensive programming to address any [assessed] needs . . . apart from . . . breathing and meditation" therapy. Although Dr. Starin believed Minor's treatment could occur in a less restrictive setting, she acknowledged that work, school, and family commitments can "get[] in the way" of treatment outside of a restrictive setting.

Finally, Minor resubmitted a suitability report that juvenile justice consultant Doug Ugarkovich had prepared for the transfer hearing. The report noted Minor was amenable to rehabilitation, made "stellar" effort toward his education, and behaved well in custody (apart from some early disciplinary issues). Ugarkovich opined Minor was eligible for YDA and could

13

be rehabilitated within the remaining period of the juvenile court's jurisdiction over Minor (approximately six years). That said, the report noted that "rehabilitation is not a function of time-served, but rather is a function of emotional growth and behavioral change."

### c. Victim Impact Statements

The court heard victim impact statements from Villa's mother, father, grandmother, brother, and cousin, all of whom testified about the devastation Minor's actions had caused. The cousin also noted that although Villa had himself experienced trauma in his youth, he had not resorted to murder.

### d. Juvenile Court's Ruling

After hearing the testimony and considering the evidence submitted at the disposition hearing, the juvenile court declared Minor a ward of the court and committed him to YDA for a baseline term of four to seven years. The court found the less restrictive HOPE program was not suitable for Minor's needs.

The court was very detailed in explaining its reasoning behind the ruling. Preliminarily, the court found that Minor's welfare required the court to remove him from his mother's custody. The court explained Minor was out past curfew and had disobeyed his mother's instructions to stay home while recuperating from his recent appendectomy. The court observed that Minor's "pattern of not following curfew is evidenced in" his prior juvenile court adjudications.

The court then examined the statutory criteria for determining whether to commit a youth to a secure youth treatment facility or to a less restrictive alternative. (§ 875, subd. (a)(3).)[10]

Regarding the severity of the offense, Minor's role in it, and the harm to the victim (§ 875, subd. (a)(3)(A)), the court found Minor's role "was significant" — he "took a knife, approached the victim, and stabbed the victim in the abdomen after the victim was no longer fighting with his friend." The court found Minor's claims of self-defense and shock at Villa's death "not wholly persuasive." The court noted Minor "was about two months shy of turning 18 years old at the time of the incident and there is no evidence that [he] did not understand the difference between right and wrong." The court found the evidence showed that Minor asked an acquaintance for a knife during a fistfight; told the victim to check his stomach while fleeing the scene; did not call 911; did not tell Javier's mother what happened; lied to his own mother about what happened; and falsely told police that Villa had sliced Javier with a knife during the fight. Minor's false

---

10    Section 875, subdivision (a)(3) sets forth the following criteria: "(A) The severity of the offense or offenses for which the ward has been most recently adjudicated, including the ward's role in the offense, the ward's behavior, and harm done to victims. [¶] (B) The ward's previous delinquent history, including the adequacy and success of previous attempts by the juvenile court to rehabilitate the ward. [¶] (C) Whether the programming, treatment, and education offered and provided in a secure youth treatment facility is appropriate to meet the treatment and security needs of the ward. [¶] (D) Whether the goals of rehabilitation and community safety can be met by assigning the ward to an alternative, less restrictive disposition that is available to the court. [¶] (E) The ward's age, developmental maturity, mental and emotional health, sexual orientation, gender identity and expression, and any disabilities or special needs affecting the safety or suitability of committing the ward to a term of confinement in a secure youth treatment facility."

statements undermined his claim during a psychological evaluation that he tends to tell the truth, and further demonstrated that he was "struggling to accept responsibility for his actions in this incident." "In considering the exculpatory circumstances" of Minor's claim that "he was defending his friend," the court found Minor's "reaction . . . was excessive." The court noted Minor "has a high level of sophistication and maturity," but reasoned he "is just starting . . . the process of rehabilitation." The court also found the harm to Villa's family was "irreparable."

Turning to Minor's previous delinquent history (§ 875, subd. (a)(3)(B)), the court gave "weight to this factor" in light of Minor's prior petitions and history of complex trauma, "which requires long-term therapeutic intervention." The court disagreed with Minor's "argu[ment] that this long-term therapeutic intervention can occur via a HOPE commit." Noting that Minor's traumatic exposure began before he became involved in the legal system, the court concluded his "pattern of behavior . . . warrants more structure and intensive therapy than what can be provided in the HOPE program." This pattern began with the 2017 petition that arose from Minor breaking into his school. The court noted Minor violated probation at least four times in connection with that case. The pattern continued in 2019 when Minor, while still on probation for his first offense, escalated his conduct by engaging in an "act of violence." Despite being "placed on home supervision and given another chance with a least restrictive alternative," Minor "struggle[]d [with] leaving his residence without permission [and] continuing to use marijuana and not attending school."

The court explained in detail why Minor's previous delinquent history rendered HOPE unsuitable for his treatment needs:

> In weighing the diagnosis identified by Dr. Starin, the amount of trauma that [Minor] has experienced, which

16

began prior to his teenage years, the length of progress [Minor] has made in his prior petitions and while currently detained, the court finds a HOPE commit simply follows the previous pattern of providing an intervention based on [Minor]'s age, as well as his willingness to participate in services, without factoring in the complex needs of [Minor] based on his Type II trauma, as identified by Dr. Starin.

Dr. Starin assessed that although the overall risk of danger is low, the subcategories of violent and aggressive tendency was deemed to be low to medium as [Minor] reacts impulsively to fear, threats, or provocation. Dr. Starin described [Minor] as a survivor of complex trauma with a dysregulated nervous system and hypersensitivity towards threats of violence due to danger in his childhood and formative years of development.

Dr. Starin indicated [Minor] needs long-term treatment, family therapy, and to address his adverse childhood experiences. This court finds that a HOPE commit is not sufficient to address [Minor]'s complex needs, despite his protective factors of being able to express himself and despite his commitment to school and his future goals, as evidenced by his conduct while detained.

. . . [Minor]'s family dynamic has been identified in Dr. Starin's psychological evaluation as an aggravating factor due to the high stress it has created in his life, which needs significant work prior to release to strengthen his success in the community.

The court next addressed whether the services provided by YDA were appropriate to meet Minor's treatment and security needs. (§ 875, subd. (a)(3)(C).) The court recognized that while Minor was "starting to take this situation seriously" and had availed himself of the services offered while awaiting trial, his progress was "only beginning to address" his "Type II complex trauma and diagnosis." The court found YDA's "intense evidence-based programming" was "most appropriate" because Minor "does

17

well with structure," as evidenced by the fact that although he struggled with school attendance prior to his detention, he completed high school and began taking college courses while detained. Despite Minor's educational progress and engagement with services while detained, the court found he still "has yet to address [his] adverse childhood experiences and complex trauma."

Citing probation officers Legorreta and Mendez, the court found YDA offered a "myriad of programs" that would meet Minor's needs. The court recognized that defense witness "Ramos testified that HOPE offers similar programming," but the court pointed out that Ramos "also acknowledged" that YDA provides extended programs "for more serious crimes" and longer "aftercare . . . because of the intensiveness of the programming."

The court next considered whether the goals of rehabilitation and community safety could be met with a less restrictive disposition. (§ 875, subd. (a)(3)(D).) The court found, for the reasons it previously stated, that the "HOPE program is not appropriate" because, whereas its "purpose . . . is to provide short-term therapeutic intervention" and aftercare, the evidence showed that Minor "needs long-term therapeutic intervention to address his complex Type II trauma." The court acknowledged the mentor's testimony that Minor was motivated to succeed, but the court noted the mentor also "conceded that someone with complex trauma and needs would benefit from long-term therapeutic intervention." The court rejected Minor's argument that a commitment to YDA constituted "incarceration for the purpose of punishment"; rather, its "evidence-based programming" serves "the purpose of rehabilitation."

Finally, the court considered Minor's age, maturity, mental and emotional health, and other needs. (§ 875, subd. (a)(3)(E).) The court found

18

he had no "exceptional needs that would impede his suitability of commitment to YDA."

Accordingly, the juvenile court committed Minor to YDA rather than to HOPE.

## 2. Relevant Legal Principles

When a minor is adjudged a ward of the juvenile court, "the court may make any reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the minor." (§ 727, subd. (a)(1).) Courts have the discretion to place such wards on probation or to order commitment to a juvenile home, ranch, camp, or forestry camp. (§§ 727, subd. (a)(2)–(3), 730, subd. (a).) "In addition to the[se] types of treatment . . . , the court may order that a ward who is 14 years of age or older be committed to a secure youth treatment facility . . . if the ward meets all of the following criteria: [¶] (1) The juvenile is adjudicated and found to be a ward of the court based on an offense listed in subdivision (b) section 707 [including murder] when the juvenile was 14 years of age or older. [¶] (2) The adjudication . . . is the most recent offense for which the juvenile has been adjudicated. [¶] (3) The court has made a finding on the record that a less restrictive, alternative disposition for the ward is unsuitable." (§ 875, subd. (a)(1)–(3).) Minor challenges only this third criterion.

In determining that a less restrictive alternative disposition is unsuitable, "the court shall consider all relevant and material evidence, including the recommendations of counsel, the probation department, and any other agency or individual designated by the court to advise on the appropriate disposition of the case." (§ 875, subd. (a)(3).) The court must also consider the criteria specified in section 875, subdivision (a)(3)(A)–(E), quoted in footnote 10 above.

19

"[T]he juvenile court has long enjoyed great discretion in the disposition of juvenile matters." (*In re Greg F.* (2012) 55 Cal.4th 393, 411.) Consequently, "[w]e review the court's placement decision for an abuse of discretion. [Citation.] We review the court's findings for substantial evidence, and ' "[a] trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence." ' " (*In re Nicole H.* (2016) 244 Cal.App.4th 1150, 1154.) " 'It is not the responsibility of this court to determine what we believe would be the most appropriate placement for a minor. This is the duty of the trial court, whose determination we reverse only if it has acted beyond the scope of reason.' " (*In re J.S.* (2016) 6 Cal.App.5th 414, 423.)

### 3. Analysis

Substantial evidence supports the findings on which the juvenile court relied when it reasonably exercised its discretion to commit Minor to YDA. The court heard and read extensive evidence and explained *in detail* on the record why it found a less restrictive disposition was unsuitable for Minor. In doing so, the court expressly addressed each criterion set forth in section 875, subdivision (a)(3)(A)–(E) and identified the evidence and reasoning supporting the court's conclusion as to each. In brief, the court reasonably concluded that Minor's unresolved complex trauma required long-term custodial therapeutic intervention and aftercare that was available only through YDA and not through HOPE.

Minor raises four challenges to the juvenile court's decision. None of those challenges has merit.

First, while conceding that the commitment offense was "very serious," Minor contends the court erred by "fail[ing] to give any weight to the mitigating evidence," inaccurately portraying him as "wholly aggressive," and

"plac[ing] excessive weight on [his] post offense conduct." The contention is unpersuasive. The juvenile court expressly stated it "consider[ed] the exculpatory circumstances" of Minor's self-defense claim but found his "reaction . . . was excessive." The record supports this conclusion. The video footage and Abraham's testimony establish that Minor first escalated the fistfight by using a skateboard as a weapon. The evidence also supports the finding that Minor was the only participant to use a knife. Although Minor told police that both Villa and Abraham were armed with knives, and Abraham testified Villa gestured *as if* he had a weapon, the video footage and Abraham's testimony undermine the claim that Villa was armed during the fight. To the extent Minor's claim conflicts with other evidence, it was the juvenile court's role to resolve the conflict, which we do not reevaluate on appeal. (See *In re N.C.* (2019) 39 Cal.App.5th 81, 87–88 ["[C]onflicting evidence . . . does not render the juvenile court's commitment order an abuse of discretion or warrant its reversal. . . . [O]ur role on appeal is to determine whether the juvenile court's order is reasonably grounded in the record, not to reweigh the evidence in the record. [Citation.] We . . . accept the juvenile court's credibility determinations for purposes of appeal"].) The juvenile court's credibility determinations are also supported by Minor's postoffense dishonesty — lying to his mother and the police about what happened — which further undermines his claim of truthfulness. Minor's postoffense dishonesty also supports the court's finding that he struggled to accept responsibility for his actions. We are therefore satisfied that the juvenile court's order is "reasonably grounded in the record" as it pertains to mitigating circumstances. (*Ibid.*)

Second, Minor argues his "history in the juvenile justice system did not support the YDA commitment." (Bolding omitted.) Specifically, he claims

the juvenile court failed to consider that his probation violations stemming from his 2019 petition may have resulted from the COVID-19 pandemic's disruption of schooling and probation services. But Minor cites no evidence in the record to support this claim, rendering it merely speculative. Moreover, his argument that the lack of in-person instruction during the pandemic hindered his education is undermined by evidence showing he performed well in online education.

Third, Minor argues no evidence showed that committing him to YDA "was necessary for his rehabilitation because he had demonstrated that he was exceptionally receptive to rehabilitative services." (Bolding omitted.) The court recognized Minor's receptiveness and progress, but reasonably found he was "just starting . . . the process of rehabilitation" and needed "more structure and intensive therapy than what can be provided in the HOPE program." The record supports this finding. One of Minor's treatment providers testified that their sessions focused on Minor's adjustment to custody and relationship issues with his girlfriend, rather than on Minor's complex trauma. The evidence also showed that although YDA and HOPE offer similar types of treatment, a HOPE commitment may be as short as six months, with limited aftercare. Several witnesses testified Minor would benefit from long-term therapeutic intervention, which supports the juvenile court's selection of the lengthier YDA program over HOPE. Although Minor contends these findings are not supported by substantial evidence because he was not formally screened for HOPE, his probation officer testified that she *considered* the HOPE program for Minor but did not formally screen him for it because of his extensive needs and the program's limitations. There was no lack of evidence at the disposition hearing about the differences between YDA and HOPE.

Minor also faults the juvenile court for citing his "family dynamic" as a basis for committing him to YDA. He maintains that while his family dynamics in early childhood contributed to his complex trauma, the probation officer's report indicated the situation had improved. As this argument reveals, Minor's family dynamics and his complex trauma are interrelated. Although dynamics may have improved, the court could reasonably conclude that therapeutic intervention for the complex trauma would resurface family dynamic issues. Indeed, the record shows that YDA encourages family involvement and therapy. Further, in explaining why it removed custody of Minor from his mother, the court noted Minor's disobeying of her orders. The court thus reasonably concluded Minor's family dynamics supported a commitment to YDA.

Finally, in a gloss on his third argument, Minor argues the juvenile court abused its discretion in committing him to YDA "because the evidence . . . did not demonstrate a probable benefit to him" inasmuch as he could have received similar services through the less restrictive HOPE program. We disagree. As noted, there was abundant testimony that YDA offered trauma-focused treatment appropriate for Minor's complex trauma. And although HOPE may have offered similar treatment options, several witnesses testified that Minor would benefit from long-term therapeutic intervention in a structured environment in which the distractions of ordinary life would not interfere with his treatment. The juvenile court appropriately weighed the benefits of YDA and HOPE and reasonably concluded from the evidence that YDA was suitable for Minor's needs and HOPE was not.

**B. The Juvenile Court Did Not Err in Selecting a Maximum Term of Confinement Beyond Minor's Twenty-fifth Birthday**

Minor contends the juvenile court erred in selecting a maximum term of confinement that extends beyond his twenty-fifth birthday because that is the date on which the court will lose jurisdiction over him. The People counter that the maximum term of confinement "is calculated independently" from any age limitations. We are persuaded by recent authority that the People have the better argument. (See *In re L.H.*, *supra*, 110 Cal.App.5th at pp. 600–601.)

### 1. Background

Before the disposition hearing, Minor filed a supplemental sentencing memorandum addressing the baseline and maximum terms of confinement. Minor recognized the court could impose a baseline term of four to seven years (rule 5.806(d)) and requested that the court select four years. Minor also recognized that the " 'theoretical' maximum term of confinement for a second degree murder is 15 years to life" (Pen. Code, § 190, subd. (a)), but argued that the court could not select a maximum term of confinement that extended beyond his twenty-fifth birthday because that is when the juvenile court will lose jurisdiction over him. Minor thus posited the maximum term of confinement was the period between the court's disposition finding and his twenty-fifth birthday, which he calculated as 5 years 6 months and 18 days.

At the disposition hearing, the court selected a baseline term of four to seven years, finding it "represents the time in custody necessary to meet the developmental and treatment needs of [Minor]." Turning to the maximum term of confinement, the court "acknowledge[d] that [Minor] will not be held in secure confinement beyond his twenty-fifth birthday" both "because the court will lose jurisdiction over [Minor] on that date" (§ 607) and because

24

Minor cannot, by statute (§ 875, subd. (c)(1)(A)), be held in confinement beyond that date.  Nevertheless, the court selected a maximum term of confinement of 15 years to life, plus one year.[11]

The juvenile court credited Minor with 605 days of precommitment custody credit against the maximum term of confinement.

## 2.  Relevant Legal Principles

"Commitment to the Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ) used to be ' "the state's most restrictive placement for its most severe juvenile offenders." ' " (*In re L.H.*, *supra*, 110 Cal.App.5th at p. 597, quoting *In re M.B.* (2024) 99 Cal.App.5th 435, 448.)  "In committing a ward to the DJJ, the juvenile court was required to set a maximum term of physical confinement [citation], which represented ' " 'the outside time limit for a statutory program aimed directly at rehabilitation.' " ' [Citation.]  A ward's actual term of confinement was ultimately determined by ' "certain [DJJ] guidelines" ' for discharging a ward [citation] and 'age limitations on confinement in [the] DJJ.' " (*In re L.H.*, at p. 597.)

"However, 'in 2020 the Legislature passed "juvenile justice realignment" through Senate Bill No. 823 (2019–2020 Reg. Sess.) (Stats. 2020, ch. 337).' [Citation.]  The purpose of the juvenile justice realignment was 'to reduce the number of juvenile offenders housed in state facilities by shifting responsibility to the county level " 'for all but the most serious youth

---

[11]     Although Minor incorrectly stated in his original appellate briefing that the court selected a maximum term of confinement of seven years, the discrepancy is inconsequential to his appellate challenge because even a seven-year commitment would extend beyond his twenty-fifth birthday.

offenders.' " ' " (*In re L.H.*, *supra*, 110 Cal.App.5th at p. 597; see *In re M.B.*, *supra*, 99 Cal.App.5th at p. 448.)

"As part of the juvenile justice realignment, Senate Bill No. 92 (2021–2022 Reg. Sess.) added section 875, which became effective on May 14, 2021. (Stats. 2021, ch. 18, § 12.) Section 875 allows for youth offenders who would have been committed to the DJJ to instead be committed to a secure youth treatment facility (or SYTF). [Citation.] Under section 875, the juvenile court must set a 'baseline term of confinement,' which 'represent[s] the time in custody necessary to meet the developmental and treatment needs of the ward and to prepare the ward for discharge.' (§ 875, subd. (b)(1).) Upon expiration of the baseline term, the court must discharge the ward to probation supervision absent certain findings. (*Id.*, subd. (e)(3).)" (*In re L.H.*, *supra*, 110 Cal.App.5th at p. 597; see *In re M.B.*, *supra*, 99 Cal.App.5th at p. 448.)

"Section 875 also directs the juvenile court to set a 'maximum term of confinement' in its commitment order." (*In re L.H.*, *supra*, 110 Cal.App.5th at p. 597; see *In re M.B.*, *supra*, 99 Cal.App.5th at p. 448.) Subdivision (c)(1) of section 875 states:

> (c)(1) In making its order of commitment, the court shall additionally set a *maximum term of confinement* for the ward based upon the facts and circumstances of the matter or matters that brought or continued the ward under the jurisdiction of the court and as deemed appropriate to achieve rehabilitation. The maximum term of confinement shall represent the longest term of confinement in a facility that the ward may serve *subject to* the following:
>
> (A) A ward committed to a secure youth treatment facility under this section shall not be held in secure confinement beyond 23 years of age, or two years from the date of the commitment, whichever occurs later. However, if the

26

ward has been committed to a secure youth treatment facility based on adjudication for an offense or offenses for which the ward, if convicted in adult criminal court, would face an aggregate sentence of seven or more years, *the ward shall not be held in secure confinement beyond 25 years of age*, or two years from the date of commitment, whichever occurs later.

(B) The maximum term of confinement shall not exceed the middle term of imprisonment that can be imposed upon an adult convicted of the same offense or offenses. . . .

(C) Precommitment credits for time served must be applied against *the maximum term of confinement* as set pursuant to this subdivision.  (Italics added.)

Section 875, subdivision (c)(2) provides:  "For purposes of this section, 'maximum term of confinement' has the same meaning as 'maximum term of imprisonment,' as defined in paragraph (2) of subdivision (d) of Section 726." In general, section 726, subdivision (d)(2) "specifies the maximum term is the middle term of imprisonment that can be imposed on an adult for the same offense."  (*In re Jose R.* (2024) 102 Cal.App.5th 839, 848.)

More generally, when a juvenile court finds that a juvenile has committed murder, the court may retain jurisdiction over the juvenile until the age of 25.  (§§ 607, subd. (c), 707, subd. (b)(1).)

### 3.  Analysis

While this appeal was pending, our colleagues in the First District, Division One, addressed the same issue Minor raises here and concluded that a juvenile's maximum term of confinement may exceed the juvenile's

twenty-fifth birthday. (*In re L.H.*, *supra*, 110 Cal.App.5th at p. 600.)[12] We requested and received supplemental briefing regarding the import of *In re L.H.* As we now explain, we find the *In re L.H.* court's reasoning and conclusion persuasive and reach the same conclusion here.

The juvenile in *In re L.H.* pleaded guilty to first degree murder and the court committed him to a secure youth treatment facility for a maximum term of confinement of 22 years and 361 days (the maximum sentence of 25 years minus 734 of precommitment credits). (*In re L.H.*, *supra*, 110 Cal.App.5th at p. 596.) On appeal, the juvenile argued the court erred by setting a maximum term of confinement beyond his twenty-fifth birthday because section 875, subdivision (c)(1)(A) provides that a juvenile " 'shall not be held in secure confinement beyond 25 years of age.' " (*In re L.H.*, at p. 599.) The People countered "that the 'jurisdictional' age limits in section 875, subdivision (c)(1)(A) constitute a ceiling on the length of a ward's physical confinement separate from the maximum term of confinement set by the juvenile court." (*In re L.H.*, at p. 599.) The appellate court agreed with the People.

The *In re L.H.* court began by examining the text of section 875, subdivision (c)(1). (*In re L.H.*, *supra*, 110 Cal.App.5th at p. 599.) The court observed that "the first sentence of section 875, subdivision (c)(1) establishes

---

12      The *In re L.H.* court was not the first court to address this issue. The court in *In re M.B.* earlier stated that the juvenile's "actual time spent in confinement will likely be shorter" than the selected maximum term of confinement because the statutory prohibition against "confinement 'beyond 25 years of age' " operates as a "separate cap." (*In re M.B.*, *supra*, 99 Cal.App.5th at p. 461, fn. 21.) As the *In re L.H.* court observed, however, the *In re M.B.* court reached this conclusion "without analysis." (*In re L.H.*, *supra*, 110 Cal.App.5th at p. 600, fn. 3.) We note that neither party cited *In re M.B.* in its original appellate briefing.

the juvenile court's discretion to determine 'a maximum term of confinement' based on the facts and circumstances of the ward's offenses." (*In re L.H.*, at p. 599.) The court then observed that the next sentence provides that the court's determination under the first sentence is " '*subject to*' the conditions enumerated in section 875, subdivision (c)(1)(A) through (C)." (*In re L.H.*, at p. 599, italics added.) Considering the subdivision as a whole, the court concluded the "subject to" terminology did not limit the court's selection of a maximum term of confinement; rather, it reflected the Legislature's intent "for the age limits set forth in section 875, subdivision (c)(1)(A) to provide a separate ceiling on the length of a ward's [actual] physical confinement." (*In re L.H.*, at p. 599.)

"To begin with," the *In re L.H.* court found "the 'subject to' language . . . consistent with an interpretation of the subparagraphs in section 875, subdivision (c)(1) as more broadly governing the ward's actual length of confinement instead of the juvenile court's discretion to set a maximum term of confinement." (*In re L.H.*, *supra*, 110 Cal.App.5th at p. 600.)

The court also found that the Legislature's use of different language within the subparagraphs of section 875, subdivision (c)(1) further supported the conclusion that "age limits should not be construed as limiting the length of the maximum term of confinement." (*In re L.H.*, *supra*, 110 Cal.App.5th at p. 601.) Specifically, the court observed that "[s]ection 875, subdivision (c)(1)(B) states that the '*maximum term of confinement* shall not exceed' the middle term of imprisonment that can be imposed upon an adult, while subdivision (c)(1)(A) states that the ward '*shall not be held* in secure confinement' beyond the age limits." (*In re L.H.*, at p. 601, italics added.) The court concluded "[t]he Legislature's use of two different phrases in these subparagraphs should be afforded significance."

(*Ibid.*; see *ibid.*, citing *People v. Jones* (1988) 46 Cal.3d 585, 596 ["[W]hen *different* words are used in contemporaneously enacted, adjoining subdivisions of a statute, the inference is compelling that a difference in meaning was intended.  And we are required to ascribe significance to every word of each statute we are called upon to apply."].)  The court interpreted "the phrase 'shall not be held in secure confinement' " as "refer[ring] to a separate cap on a ward's actual confinement time" because "[i]f the Legislature had intended for the age limits to limit the maximum term of confinement, it could have easily said so."  (*Ibid.*; see, e.g., § 875, subd. (c)(1)(C) [providing that precommitment custody credits "must be applied against the *maximum term of confinement*" (italics added)].)

Beyond the express language of the statute, the *In re L.H.* court concluded that the juvenile's proposed interpretation "would violate at least three other well-accepted principles of statutory interpretation based on extrinsic aids."  (*In re L.H.*, *supra*, 110 Cal.App.5th at p. 602.)  The first applicable "principle of statutory construction is that courts presume the Legislature intended similar statutory language covering similar subjects to be similarly construed."  (*Ibid.*)  The court noted that when the Legislature enacted section 875, the courts had already interpreted the predecessor DJJ statutes' "age limits" — including section 607's jurisdictional limit — "as providing a cap on a ward's actual confinement *separate from* the maximum term of confinement set by the juvenile court."  (*In re L.H.*, at p. 603, italics added.)  Because the Legislature included in section 875 "language parallel to that in the DJJ statutes and section 607, which have been construed as providing two separate ceilings on the length of a ward's physical confinement based on jurisdictional age limits and the maximum term of confinement set by the juvenile court," the *In re L.H.* court "presume[d] the

30

Legislature intended to adopt the same construction of the age limits and the maximum term of confinement in the [secure youth treatment facility] context." (*In re L.H.*, at p. 604; see *Snukal v. Flightways Manufacturing, Inc.* (2000) 23 Cal.4th 754, 766 [applying "the principle of statutory construction that legislation framed in the language of an earlier enactment on the same or an analogous subject that has been judicially construed is presumptively subject to a similar construction"].) The court reasoned that this interpretive principle "would . . . explain the difference in phrasing between subdivision (c)(1)(A) and subdivision (c)(1)(B) of section 875," as noted above. (*In re L.H.*, at p. 604.)

"Beyond disregarding the similarities between section 875, section 607, and the DJJ statutes," the *In re L.H.* court concluded that the juvenile's "proposed construction would also violate the principle that '[c]hanges in wording and phraseology are presumed to have been deliberately made' by the Legislature." (*In re L.H.*, *supra*, 110 Cal.App.5th at p. 604.) Specifically, the court pointed out that, as initially enacted, section 875, subdivision (c)(1) expressly tied the juvenile's age to the maximum term of confinement: " '*the maximum period of confinement shall not exceed the ward attaining 25 years of age* or two years from the date of commitment, whichever occurs later.' (§ 875, former subd. (c)(1), italics added, as added by Stats. 2021, ch. 18, § 12.)" (*In re L.H.*, at p. 604.) But the following year, the Legislature replaced this phrase with "the ward *shall not be held* in secure confinement beyond 25 years of age." (Stats. 2022, ch. 58, § 41, italics added; see *In re L.H.*, at p. 604.) The *In re L.H.* court could "perceive of no other reason for th[is] change" than to untether the maximum term of confinement from the statutory age limits on confinement. (*In re L.H.*, at p. 604.)

31

With respect to legislative intent, the *In re L.H.* court concluded "the People's proffered interpretation comports with the purposes of precommitment credits and the juvenile justice system because the maximum term of confinement would be based on the ward's offenses (§ 875, subd. (c)(1)(B), (c)(2)) and what is 'deemed appropriate to achieve rehabilitation' (*id.*, subd. (c)(1))." (*In re L.H.*, *supra*, 110 Cal.App.5th at p. 606.) By contrast, the juvenile's proposed interpretation "would produce unfair results" by affording different treatment to people "convicted of the same offense." (*In re L.H.*, at p. 605.) That is, "If the maximum term of confinement is limited by the jurisdictional age limits, those wards whose physical confinement will be cut short by the age limits will receive even shorter sentences upon the application of precommitment credits, while other wards who committed the same offense under similar circumstances will have their precommitment credits applied to the full confinement term simply because they were younger at the time of sentencing." (*Ibid.*) The court concluded " '[t]here is simply no reason for the different treatment' here." (*In re L.H.*, at p. 606.)

Finally, the *In re L.H.* court addressed the juvenile's related argument that "the setting of the maximum term of confinement would be an idle act if the age limits in section 875, subdivision (c)(1)(A) constitute a separate cap on the length of a ward's physical confinement." (*In re L.H.*, *supra*, 110 Cal.App.5th at p. 606.) The court disagreed, reasoning that "this would not be true in every case"; for example, "there would be many instances where a ward's maximum term of confinement will end before the ward reaches the applicable age limit." (*Ibid.*)

Based on the statutory language, "the parallels with analogous statutes, and the consequences of [the juvenile]'s proposed interpretation,"

the *In re L.H.* court concluded it was "compelled to conclude that the age limits found in section 875, subdivision (c)(1)(A) constitute a cap on the length of a ward's physical confinement separate from the maximum term of confinement set by the juvenile court in its order of commitment." (*In re L.H.*, *supra*, 110 Cal.App.5th at p. 606.)

The People urge us to follow *In re L.H.* Minor, however, argues the case was "wrongly decided for several reasons." First, Minor argues the case focused narrowly on the language of section 875 without addressing the separate section 607 jurisdictional question. However, the court expressly discussed section 607 when explaining that the courts previously interpreted the DJJ predecessor statutes' "age limits . . . as providing a cap on a ward's actual confinement time separate from the maximum term of confinement set by the juvenile court." (*In re L.H.*, *supra*, 110 Cal.App.5th at p. 603; see *id.* at p. 607 [noting that prior cases distinguished between " the 'maximum *custodial* term' " and the " 'maximum *exposure* term' (or the '*theoretical* maximum term')" (italics added)], quoting *In re Ernesto L.* (2022) 81 Cal.App.5th 31, 34.)[13]

Minor also argues the *In re L.H.* court unreasonably relied on the supposed unfairness to younger offenders that would result if precommitment credits were applied to the statutory age limits instead of the maximum term of confinement. Minor reasons this unfairness results from the age limits, themselves, rather than the interpretation of the maximum term of confinement. While true to an extent, the unfairness imposed by the age

---

[13]    By analogy, Minor cites cases addressing the maximum period of probation allowed in adult criminal cases. (See *People v. Kite* (2023) 87 Cal.App.5th 986; *People v. Canedos* (2022) 77 Cal.App.5th 469, review granted June 29, 2022, No. S274244.) We find these cases unenlightening in the context of the nuanced question of juvenile delinquency law before us.

limits would be exacerbated by Minor's proposed approach. In addition, Minor does not address the countervailing policy implications the *In re L.H.* court cited, such as aligning a ward's commitment with the seriousness of the commitment offense and with "what is 'deemed appropriate to achieve rehabilitation.' " (*In re L.H.*, *supra*, 110 Cal.App.5th at p. 606., quoting § 875, subd. (c)(1).) These considerations are reflected in the Legislature's express provision that "[p]recommitment credits for time served must be applied against the maximum term of confinement" rather than the statutory age limit. (§ 875, subd. (c)(1)(C).)

More generally, Minor does not engage with several of the *In re L.H.* court's more compelling reasons for concluding the maximum term of confinement operates independently from statutory age limits. For example, Minor does not explain why the Legislature used the phrase "maximum term of confinement" in every part of section 875, subdivision (c) except the paragraph that imposes age limits. (Compare § 875, subd. (c)(1), (c)(1)(B)–(C), (c)(2) with *id.* subd. (c)(1)(B); see *In re L.H.*, *supra*, 110 Cal.App.5th at pp. 597–598.) Nor does Minor address the significance of the Legislature's amendment of section 875 to replace the original age-based "maximum period of confinement" with the current restriction that a "ward shall not be held . . . beyond" a certain age. (Compare Stats. 2021, ch. 18, § 12 with § 875, subd. (c)(1)(A); see *In re L.H.*, at p. 604.)

Finally, we observe that there is no legitimate concern that Minor will actually serve an unauthorized commitment that extends beyond his twenty-fifth birthday. The juvenile court expressly "acknowledge[d] that [Minor] will not be held in secure confinement beyond his twenty-fifth birthday" both because of the court's jurisdictional limits and because of section 875, subdivision (c)(1)(A)'s age limits. In addition, the court stated it

34

will conduct statutorily required six-month review hearings to monitor the commitment and Minor's progress, thus ensuring he will not be held beyond his twenty-fifth birthday.  (See § 875, subd. (e)(1) ["The court shall, during the term of the commitment, . . . schedule and hold a progress review hearing for the ward not less frequently than once every six months."].)

For these reasons, we find *In re L.H.* persuasive.  Applying its reasoning, we conclude the juvenile court did not err by selecting a maximum term of confinement for Minor that extends beyond his twenty-fifth birthday.

## IV.  DISPOSITION

The judgment is affirmed.


RUBIN, J.

WE CONCUR:


O'ROURKE, Acting P. J.


BUCHANAN, J.

35